# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

LINDA TERRY

VERSUS

PROMISE HOSPITAL OF
ASCENSION, INC.

CIVIL ACTION

NO. 13-128-SDD-RLB

## RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by the Defendant, Promise Hospital of Ascension, Inc. ("Defendant"). Plaintiff, Linda Terry ("Plaintiff") has filed an *Opposition*[2] to the motion. Each party also filed *Reply* briefs.[3] For the reasons which follow, the Court finds that the Defendant's motion should be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

On March 9, 2004, Plaintiff was hired by the Defendant as a Respiratory Therapist/Technician in Defendant's multi-site hospital which specializes in the treatment of long term acute care patients. Plaintiff's position required state licensing and strict adherence to laws and policies to ensure patient safety. Plaintiff directly reported to Sherri Bridges ("Bridges"), Director of Respiratory Therapy. Plaintiff worked the night shift and

---

[1] Rec. Doc. No. 28.

[2] Rec. Doc. No. 30.

[3] Rec. Doc. Nos. 31 & 34.

was the only Respiratory Therapist on duty on her medical unit.

Defendant contends that Plaintiff, along with all respiratory therapists employed by Defendant, was advised of the procedure for retrieving medication from the MedDispense system, which was designed to track medication inventory and distribution.[4] This automated prescription dispenser was put in place in September of 2010 in an effort to ensure proper administration of patient medications. During this time, the respiratory therapists were trained on use of the system, and Defendant contends they were specifically informed to retrieve only the correct dosage for a single patient at a time. Respiratory therapists and nurses were required to sign into the machine with their own log-in and password, then retrieve the prescription medication for a single patient to be administered according to doctor's orders.

To ensure compliance with Defendant's policy and procedures, the MedDispense system generates daily reports showing all transactions for each patient. This procedure is governed by Defendant's Medical Management Policy "Drug Preparation and Storage Areas."[5] Any violation of this policy is governed by Human Resources Policy 511.[6] Defendant contends that receiving multiple doses from the MedDispense system for future use is considered a "Category One Violation" for falsification of facility records, a violation for which immediate termination is warranted.[7]

Plaintiff signed the employee handbook acknowledgment form regarding Human

---

[4] See Rec. Doc. No. 28-4, pp. 16-19 (Deposition of Linda Terry, Exhibit A, pp. 125-128; 139).

[5] Rec. Doc. No. 28-6 (Exhibit C).

[6] Rec. Doc. No. 28-7 (Exhibit D).

[7] Id. at p. 2.

Resource Policy 511[8] and also the MedDispense Memo acknowledgment.[9] This Memo advised that respiratory therapists could only retrieve the correct dose for a patient at any one time and were prohibited from pulling multiple doses for future use.[10] Defendant cites Plaintiff's deposition testimony where she testified that she understood that the purpose of the MedDispense system was to keep track of medications and for accountability.[11] Although she acknowledged that she understood the prohibitions under the system, Plaintiff admitted that she had a "bunch" of medications that were not within the MedDispense system,[12] and that she pulled more than one dosage at a time with knowledge that this violated the policy.[13]

On July 8, 2011, Bridges received a call from another respiratory therapist who reported concerns regarding Plaintiff's possible falsification of documentation on a patient's chart.[14] This employee further advised Bridges that, as he arrived for his morning shift following Plaintiff's night shift, he discovered an unused nebulizer equipment package in a patient's room. This apparently raised a red flag for the employee because the notation in the patient's chart indicated that Plaintiff had administered the medication via the nebulizer. Bridges investigated the matter and concluded that Plaintiff had not

---

[8] Rec. Doc. No. 28-9 (Exhibit F).

[9] Rec. Doc. No. 28-8 (Exhibit E).

[10] Rec. Doc. No. 28-5 (Exhibit B).

[11] Rec. Doc. No. 28-4, p. 23 (Deposition of Linda Terry, Exhibit A, p. 134).

[12] *Id.* at pp. 24-25 (Deposition of Linda Terry, Exhibit A, pp. 134-135).

[13] *Id.* at p. 32 (Deposition of Linda Terry, Exhibit A, p. 151).

[14] Rec. Doc. No. 28-10 (Exhibit G).

administered a nebulizer treatment to the patient on July 3, 2011 because the nebulizer remained unused until the following morning.[15]

As a follow-up, Bridges asked the pharmacy to generate a report detailing all medication administration for the patient in question on July 3, 2011. This report revealed that Plaintiff had not pulled the patient's medication from the MedDispense system as she was required to do. Thus, on July 13, 2011, Bridges along with Katie Chavers ("Chavers"), a Caucasian Human Resources Coordinator, and Wendy Cobbs ("Cobbs"), an African-American Director of Human Resources, met with Plaintiff to discuss the investigation and get an explanation from Plaintiff.[16]

Defendant contends that, when questioned, Plaintiff gave two conflicting stories regarding the medication error. First, in the meeting with Bridges, Chavers, and Cobbs, Plaintiff stated that she pulled additional medications at one time when the machine malfunctioned and did not indicate the quantity count to reflect this on the MedDispense system.[17] Then later, Defendant contends Plaintiff stated that she pulled some medication from a "stash" kept in a cart in the office used by all of the respiratory therapists.[18] Defendant contends that both accounts are clear violations of the MedDispense policy. Further, Defendant argues that a "stash" would be a violation because all medications were required to be obtained from the MedDispense system by using a MedDispense log-in and

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at p. 2 (Exhibit G, ¶ 16).

[18] *Id.*

password specific to each individual respiratory therapist. Defendant further contends that its records do not reveal a MedDispense malfunction on the night in question as Plaintiff claimed.[19]

Following this meeting, Bridges suspended Plaintiff pending further investigation. Because Bridges was going to be on vacation until July 25, 2011, she advised Plaintiff that the investigation would not be completed before that date.[20] When Bridges returned, she pulled records for the other respiratory therapists who worked the same week of Plaintiff's violations to determine the truth of Plaintiff's allegations that all of the respiratory therapists pulled from the aforementioned "stash." After reviewing the records of the other four respiratory therapists, Bridges found no such medication discrepancies.[21] In sharp contrast, Bridges reviewed the pharmacy report for Plaintiff's activity from the same week - July 3 through July 9, 2011 - and discovered forty-seven instances of improper documentation by Plaintiff. Specifically, Bridges discovered: fourteen episodes of falsification by Plaintiff for Patient Number 1 from July 1 through July 6;[22] twelve episodes of falsification for Patient Number 2 from July 1 through July 6;[23] six episodes of falsification by Plaintiff for Patient Number 3 from July 3 through July 5;[24] eleven episodes

---

[19] Rec. Doc. No. 28-12 (Promise Malfunction Log, Exhibit I).

[20] Rec. Doc. No. 28-10, p. 2 (Exhibit G, ¶ 18).

[21] *Id.* The other respiratory therapists were Debbie Goita (Caucasian), Beverly Jackson (African-American), Darrin Kimble (Caucasian), and Linda Graham (Caucasian).

[22] Rec. Doc. No. 28-14 (Exhibit K).

[23] Rec. Doc. No. 28-15 (Exhibit L).

[24] Rec. Doc. No. 28-16 (Exhibit M).

of falsification for Patient Number 4 from July 1 through July 5;[25] and four episodes of falsification by Plaintiff for Patient Number 5 from July 5 through July 6.[26]

On August 8, 2011, Briges, Cobbs, and Chavers met with Plaintiff to advise that the investigation revealed extreme malfeasance and that she was being terminated. At this point, Plaintiff allegedly again claimed that she pulled additional medications from the MedDispense machine at one time. Defendant contends this was impossible because when the pharmacy reconciled the MedDispense system, there were no discrepancies in the amounts of medications within the system and the amounts said to have been withdrawn. Thus, Defendant contends that, if Plaintiff's story was true, the MedDispense system would have shown discrepancies to account for the extra medications she pulled. Plaintiff also claimed machine error, which Defendant dispels by noting that, if this had actually been the case, the inventory count would have been incorrect. Chavers advised Plaintiff that her conduct was a Category One Violation under Policy 511 for falsifying facility records and that she was terminated.

Plaintiff paints a much different picture of these events. Plaintiff alleges that, on July 12, 2011, Bridges called her cell phone and demanded that she meet with Human Resources. Plaintiff also claims that, during this conversation, Bridges called Plaintiff a "nigger" and stated that she intended to fire her and replace her with a white woman.[27] At the July 13, 2011 meeting, Plaintiff claims that she denied any wrongdoing and explained

---

[25] Rec. Doc. No. 28-17 (Exhibit N).

[26] Rec. Doc. No. 28-18 (Exhibit O).

[27] Rec. Doc. No. 30-3.

that the MedDispense machines may not have a record of her activity because she sometimes removed multiple medications from the MedDispense machine at one time, and because she sometimes did not obtain the medications from the MedDispense machine because there was additional medicine in the "stash" outside of the machines. According to Plaintiff, this was "common practice."[28]

Despite her explanations, Plaintiff claims that she was suspended without pay pending further investigation. Plaintiff further claims that she was so distraught over her suspension that she checked herself into an in-patient psychiatric facility at Our Lady of the Lake for severe anxiety and depression.[29] While on suspension, Plaintiff alleges that she called and complained about Bridges' discriminatory comment.[30] Notwithstanding this complaint, Plaintiff contends that Bridges remained in charge of the investigation and made the ultimate decision to terminate her on August 8, 2011, while Plaintiff was on medical leave.

Additionally, Plaintiff argues that there is no evidence of a formal, written policy regarding use of the MedDispense system, and the Defendant relies only on an email sent to Bridges in 2010 describing the procedure for accessing medicine from MedDispense machines.[31] Plaintiff contrasts this email with Defendant's formal "Drug Preparation and Storage Areas" policy which indicates that medication may be kept in a variety of areas

---

[28] *Id.* at ¶ 6.

[29] Rec. Doc. No. 30-5.

[30] Rec. Doc. No. 30-6.

[31] Rec. Doc. No. 30-9.

including "locked medication carts, locked cabinets, locked boxes, in MedDispense machines or refrigerators."[32] Plaintiff argues this evidence shows that the MedDispense system was seriously flawed and its implementation came with several problems. Plaintiff cites the declarations of two former employees of Defendant who essentially affirm that there were often problems with the MedDispense machines.[33] Plaintiff points to the Declaration of Marcia Dupin, a respiratory therapist formerly employed by Defendant, wherein Dupin stated: "It was normal procedure for extra medications to be kept in an open med cart outside of the MedDispense machines. It was normal for the staff to remove additional medication from the MedDispense machines."[34] Plaintiff contends that, because of these common problems with the MedDispense system, the respiratory therapists and nursing staff "adopted a variety of customary practices to ensure that they would always have the necessary medication" to treat their patients.[35]

Plaintiff also contends that her evidence confirms Defendant's knowledge of this problem with the MedDispense machines and knowledge of its staff working around those problems. Plaintiff cites a memorandum to Defendant's respiratory therapists from Bridges dated September 15, 2011, one month after Plaintiff's termination, wherein Bridges

---

[32] Rec. Doc. No. 30-10. The Court notes that Plaintiff has taken liberty in quoting this portion of the policy. It does not read within the quotations exactly as Plaintiff has set forth, but rather reads: "Medications are stored via various mechanisms within the pharmacy and throughout the hospital either in locked medication carts, locked cabinets, locked boxes or in MedDispense machines. Medication storage refrigerators are available on the units."

[33] See Rec. Doc. No. 30-15 (Declaration of Marcia Dupin) and Rec. Doc. No. 30-17 (Declaration of Sean Keiser).

[34] Rec. Doc. No. 30-11 (Declaration of Marcia Dupin).

[35] Rec. Doc. No. 30, p. 5.

acknowledges that staff is "hoarding supplies."[36] This memorandum further states: "We are now allowed to pull our entire **round** of medications at one time!!!"[37] Plaintiff contends all the evidence in this matter clearly indicates that Defendant knew that many other employees were committing the allegedly prohibited conduct for which Plaintiff was fired.

In response to Plaintiff's version of events, the Defendant counters that, despite Plaintiff's attempt to cloud the issue, she has not disputed the fact that no other respiratory therapist working in the same facility at the same time in question had any discrepancies, whereas Plaintiff had forty-seven in the same time span. Defendant also contends that this fact is not undermined by statements from former employees who had experienced malfunctions in the MedDispense system because they were not employed by Defendant during the relevant time in question.

Plaintiff filed suit against the Defendant, alleging violations of Title VII of the Civil Rights Act,[38] the Americans with Disabilities Act,[39] the Louisiana Employment Discrimination Law,[40] and the Family Medical Leave Act.[41] The Defendant now moves for summary judgment on all of Plaintiff's claims.

---

[36] Rec. Doc. No. 30-13.

[37] *Id.* (emphasis in original).

[38] 42 U.S.C. § 2000, *et seq.*

[39] 52 U.S.C. § 12101, *et seq.*

[40] La. Rev. Stat. Ann. § 23:301, *et seq.*

[41] 29 U.S.C. § 2601, *et seq.*

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[42] The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[43] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[44] If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[45]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there

---

[42] Fed. R. Civ. P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

[43] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir. 1995).

[44] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (*quoting Celotex*, 477 U.S. at 323-25, 106 S.Ct. at 2552).

[45] *Id.* at 1075.

is a genuine issue for trial.[46] The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[47] Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[48] The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[49] Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[50]

## B.     Race Discrimination under Title VII of the Civil Rights Act

Under Title VII, it is an "unlawful employment practice for an employer ... to discharge any individual ... because of such individual's race[.]"[51] To prevail on her discrimination claim, Plaintiff must present direct or circumstantial evidence that her race was a motivating factor for Defendant's adverse employment action.[52] " 'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or

---

[46] *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

[47] *Little*, 37 F.3d at 1075;  *Wallace*, 80 F.3d at 1047.

[48] *Wallace*, 80 F.3d at 1048 (*quoting Little*, 37 F.3d at 1075).  *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

[49] *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).

[50] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[51] 42 U.S.C. § 2000e–2(a)(1).

[52] *See, e.g., Siddiqui v. AutoZone West, Inc.*, 731 F.Supp.2d 639, 648 (N.D.Tex. 2010) (Fitzwater, C.J.) (addressing Title VII claims for rase-based harassment, discrimination based on race, ethnicity, national origin, and religion, and retaliation) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 652 (5th Cir. 2004)).

presumption.'"[53]   "If an inference is required for the evidence to be probative as to [Defendant's] discriminatory animus in firing [Plaintiff], the evidence is circumstantial, not direct."[54]   "If the Plaintiff provides direct evidence, then the burden shifts to the employer to prove that the same adverse action would have occurred regardless of discriminatory animus."[55]   If the Plaintiff provides circumstantial evidence, "the modified *McDonnell Douglas* approach" applies.[56]

Where a plaintiff presents direct evidence of discrimination, the *McDonnell Douglas* framework does not apply in determining whether a genuine issue of material fact exists.[57] Thus, "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case."[58]   Instead, where "a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would

---

[53] *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n. 3 (5th Cir. 2003) (Fitzwater, J.) (age discrimination case) (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002)).

[54] *Sandstad*, 309 F.3d at 897–98.

[55] *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 272 (5th Cir. 2006) (per curiam) (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).

[56] *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case).

[57] *See Lazarou v. Mississippi State University*, 549 F. App'x 275, 279 (5th Cir. Dec. 17, 2013)(citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").

[58] *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002).

have been made regardless of the forbidden factor."[59]

This second, "mixed-motive" framework was established in *Price Waterhouse v. Hopkins*,[60] which recognized that an employment decision may be motivated by a "mixture of legitimate and illegitimate motives."[61] "Once the burden of persuasion shifts to the employer under *Price Waterhouse*, the employer may escape liability only if it proves that it would have made the same employment decision based on purely legitimate reasons." "[P]roving that the same decision would have been justified ... is not the same as proving that the same decision would have been made."[62] Nor may an employer "meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason."[63] "The very premise of a mixed-motives case is that a legitimate reason was present...."[64] "The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision."[65]

In this case, the parties dispute whether Plaintiff has presented direct evidence of

---

[59] *Brown v. East Mississippi Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir. 1993); *see also Sandstad,* 309 F.3d 893 at 896 ("If the plaintiff produces direct evidence that discriminatory animus played a role in the decision at issue, the burden of persuasion shifts to the defendant, who must prove that it would have taken the same action regardless of discriminatory animus.").

[60] 490 U.S. 228 (1989).

[61] *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 355 (5th Cir. 2005)(quoting *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 310 (5th Cir. 2004)(internal quotations omitted).

[62] *Price Waterhouse,* 490 U.S. 228, 252 (1989), *overruled on other grounds by* the Civil Rights Act of 1991 (internal quotations omitted).

[63] *Id.*

[64] *Id.*

[65] *Id.*

discrimination.  Plaintiff contends her allegation that Bridges called her a "nigger" and told Plaintiff she would be replaced by a white woman, in connection with her suspension and ultimate termination, is direct evidence of race discrimination as set forth in her declaration and deposition testimony.  Defendant contends that, because Plaintiff's declaration is "rife with inconsistencies" and "directly contradicts her deposition testimony,"[66] it is insufficient summary judgment evidence under Fifth Circuit caselaw which holds that a party cannot use an affidavit that contradicts prior sworn deposition testimony to raise a fact issue.

Defendant correctly avers that the court "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."[67]  However, if the affidavit "merely supplements rather than contradicts prior deposition testimony," it may be considered when resolving the motion for summary judgment.[68]  Permissible supplementation includes providing "greater detail or additional facts not previously provided in the deposition."[69]  But, of course, "[u]nsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."[70]

Here, the Court does not find that Plaintiff's declaration is "rife with inconsistencies" or that it directly contradicts her deposition testimony, particularly with respect to the

---

[66] Rec. Doc. No. 31, p. 3.

[67] *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

[68] *Id.* at 496.

[69] *Id.*

[70] *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997).

primary allegation that Bridges called her a "nigger" in connection with her investigation, suspension, and ultimate termination. In fact, the EEOC Charge,[71] Plaintiff's deposition testimony,[72] and Plaintiff's declaration[73] all contain this consistent allegation. Moreover, the Court finds that this allegation does not evince a subjective belief or mere conclusion but rather attests that Bridges made a statement to her which expressed a discriminatory motive. Defendant also attacks this evidence based on Plaintiff's inconsistent accounts of reporting/not reporting the incident. While it is true that Plaintiff's EEOC Charge states that she did not report the incident, both her deposition testimony and declaration attest that she did report this comment during her suspension period. Defendant contends that Plaintiff testified in her deposition that she did not report this allegation until after she was terminated.[74] However, a close reading of Plaintiff's deposition transcript does not support Defendant's assertion. When asked if Plaintiff reported or told anyone at Promise what Bridges allegedly said any time before she left employment, she responded: "Yes." When asked "who did you tell," Plaintiff responded: "I called the hotline. I spoke to somebody named Tony."[75] When asked if she was still at work when she reported these allegations,

---

[71] Rec. Doc. No. 28-19, p. 8 ("On July 12, 2011, Sherri Bridges, White, Certified Respiratory Therapist made a one time comment saying, 'I am going to get rid of you nigger, so I can hire a White woman.' I never reported the incident and there were no witness.").

[72] Rec. Doc. No. 28-4, p. 33 (Deposition of Linda Terry, p. 153)("She said, 'Linda you have to come in for a meeting.' And I said, 'what's going on.' She said 'I'm going to fire you nigger and I'm going to hire a white woman,' and she hung up.").

[73] Rec. Doc. No. 30-3, p. 1, ¶ 2: "In July 2011, my supervisor, Sherrie Bridges called me on the phone and told me to come in the next day for a meeting with HR. Sherrie would not explain why I needed to attend the meeting, but called me a 'nigger' and said that she was going to fire me and hire a white woman."

[74] Rec. Doc. No. 31, p. 4.

[75] Rec. Doc. No. 28-4, p. 35 (Deposition of Linda Terry, p. 155).

Plaintiff responded, "No" and testified that it was "sometime in July."[76] Although this occurred after Plaintiff's suspension, it was not after her termination which occurred in August. This is further supported by a document with the heading: "Information that follows was used in determining cause for termination:"[77] Beneath this heading appears several bulleted items, including the final bullet point which states: "There is nothing to substantiate Linda's accusation that Sherri suspended her because she is African American and at no time did the environment become hostile."[78] This evidence confirms that Defendant was aware of the allegation against Bridges before making the decision to terminate Plaintiff. Plaintiff's declaration likewise states, "After the meeting, I reported Sherrie Bridges' discriminatory comments to Promise."[79] Although the Court recognizes that there are slight inconsistences in timing, such as when Plaintiff reported the allegations against Bridges, the Court cannot find that these documents are so wholly contradictory as to render them completely unreliable, especially considering the fact that Defendant's own documentation acknowledges that Bridges reported the discrimination prior to her termination.[80]

Defendant also challenges Plaintiff's declaration as self-serving. The Fifth Circuit has held that "[a] party's own testimony is often 'self-serving,' but we do not exclude it as

---

[76] *Id.* at p. 36 (Deposition of Linda Terry, p. 156, lines 1-3).

[77] Rec. Doc. No. 30-6.

[78] *Id.*

[79] Rec. Doc. No. 30-3, p. 1, ¶ 4.

[80] Rec. Doc. No. 30-6 ("There is nothing to substantiate Linda's accusation that Sherri suspended her because she is African American and at no time did the environment become hostile.").

incompetent for that reason alone."[81] Rather, "an affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving."[82] Moreover, "[i]If all 'self-serving' testimony were excluded from trials, they would be short indeed."[83]

In the present case, Plaintiff's declaration does not contain speculation as to Bridges' state of mind. Rather, Plaintiff tells her version of the phone conversation. If Plaintiff appears credible on the witness stand, a jury may find in her favor. Of course, Plaintiff's credibility is ultimately a question of fact for the jury, not this Court, to decide.

Next, the Court must determine if this single allegation of a one time comment revealing a discriminatory motive, to which there are no witnesses, suffices as direct evidence of race discrimination. For a remark to constitute direct evidence of racial discrimination, it must meet the four factor test in *Auguster v. Vermilion Parish School*

---

[81] *C.R. Pittman Const. Co., Inc. v. National Fire Ins. Co. of Hartford*, No. 10-30950, 453 F. App'x 439, 443 (5th Cir. Oct. 24, 2011),citing *Rushing v. Kan. City S. Ry.*, 185 F.3d 496, 513 (5th Cir.1999), *superseded by* Fed.R.Evid. 103(a) *on other grounds as recognized in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n. 16 (5th Cir. 2002) ("[M]erely claiming that the evidence is self-serving does not mean we cannot consider it or that it is insufficient. Much evidence is self-serving and, to an extent, conclusional.")

[82] *Id.* (*See, e.g., Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) ("Provided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) ("[A] 'party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.' " (quoting *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n. 5 (1st Cir. 1997))); *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) ("A court may not disregard evidence merely because it serves the interests of the party introducing it."); *Williams v. Shields*, 77 Fed.Appx. 501, 503 (10th Cir. 2003) (unpublished) ("As long as an affidavit is 'based upon personal knowledge and sets forth facts that would be admissible in evidence,' ... such averment of a party is legally competent to oppose summary judgment, notwithstanding its inherently self-serving nature." (internal citation omitted))).

[83] *Id.*

*Board*: The statement must be (1) related to the protected class of persons of which the Plaintiff is a member, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue.[84]

The Court finds that the alleged comment meets all four requirements. First, clearly calling Plaintiff a "nigger" is related to her protected African-American class. Second, the comment was allegedly made in connection with Bridges' demand that Plaintiff appear at a meeting which led to her suspension and ultimate termination. Third, while Defendant disputes that Bridges was the final decision maker for Plaintiff's termination, the Court must view the evidence in this case in the light most favorable to the Plaintiff and find that Bridges was such an individual. The record establishes that Bridges was Plaintiff's direct supervisor, led the investigation into Plaintiff's conduct along with two others, and ultimately recommended that Defendant terminate the Plaintiff. Defendant's memorandum acknowledges Bridges' authority by noting that "Bridges then placed Terry on suspension pending further investigation,"[85] and "[u]pon her return, Bridges completed the investigation .... ."[86] Likewise, the memo referenced above detailing the information used in determining the cause for Plaintiff's termination clearly indicates that Bridges led the investigation and the meeting, placed Plaintiff on suspension, and recommended Plaintiff's termination.[87]

---

[84] 249 F.3d 400, 405 (5th Cir. 2001).

[85] Rec. Doc. No. 28-1, p. 5.

[86] *Id.* at p. 6.

[87] Rec. Doc. No. 30-6; *see also*, Rec. Doc. No. 30-7, p. 3 (Deposition of Katie Chavers, p. 48).

It simply cannot be said that Bridges lacked authority over the employment decision at issue. Finally, the Court also must find that the fourth requirement is satisfied since Bridges allegedly made this comment in direct connection with requiring Plaintiff to attend the meeting, suspending Plaintiff, and allegedly threatening to replace Plaintiff with a white woman.

In *Jones v. Robinson Property Group, L.P.*,[88] the Fifth Circuit reversed the district court's grant of summary judgment in favor of an employer in a race discrimination suit. Jones had applied for a position as a poker dealer with a casino. Jones had submitted applications at least ten times in seven years, but was never hired by the casino on a permanent basis. Two of the casino's previous employees claimed that Ken Lambert, the poker room manager, used the "n" word very often and made directly discriminatory comments in relation to hiring African-Americans.[89] Jones sued the casino, and the district court granted the casino's motion for summary judgment finding that Jones had not presented direct evidence of discrimination and also failed to establish a *prima facie* case with circumstantial evidence.[90]

In reversing the trial court, the Fifth Circuit noted: "We have previously held that 'statements or documents which show on its face that an improper criterion served as a basis - not necessarily the sole basis, but a basis - for the adverse employment action are

---

[88] 427 F.3d 987 (5th Cir. 2005).

[89] *Id.* at 990-91.

[90] *Id.* at 991.

direct evidence of discrimination."[91] When a person or persons with decision making authority evinces racial animus that may constitute direct evidence of discrimination."[92] The court also stated that it had "previously observed that racial epithets undoubtedly demonstrate racial animus."[93]

The court further explained:

> Because this case is before us on summary judgment review, we are required to view the evidence in the light most favorable to Jones, taking the record evidence and all reasonable inferences therefrom in his favor. *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). We should assume the truth of the statements in the record; it is inappropriate to make credibility determinations or weigh the evidence on summary judgment. *Id.* Upon extensive review of the parties' arguments and the record in this case, and mindful of the summary judgment standard, we find that Jones has demonstrated direct evidence of discrimination.[94]

One witness had attested that Lambert stated that "they hired who they wanted to hire and the[y] were not going to hire a black person unless there were extenuating circumstances," and that "good old white boys don't want blacks touching their cards in their face."[95] A second witness stated that Lambert had said "maybe I've been told not to hire too many blacks in the poker room."[96] The court found that this evidence "proves,

---

[91] *Id.* at 993, quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citing *Fierros v. Tex. Dept. of Health*, 274 F.3d 187, 192 (5th Cir. 2001)).

[92] *Id. See Causey v. Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004) (citations omitted); *see also Young v. City of Houston, Tex.*, 906 F.2d 177, 180–81 (5th Cir. 1990) (citing *Kendall v. Block*, 821 F.2d 1142, 1145–46 (5th Cir. 1987))("This court has implied that calling an employee a 'nigger' would be direct evidence of race discrimination.").

[93] *Id.*, citing *Causey*, 394 F.3d at 289 n. 2.

[94] *Id.*

[95] *Id.*

[96] *Id.*

without inference or presumption, that race was *a* basis in employment decisions in the poker room at Horseshoe."[97] The court also stated that "[t]he evidence need not show that race was the sole basis in order to constitute direct evidence."[98]

Notably, the court rejected the argument that one witness' deposition testimony was too inconsistent with her declaration to be probative:

> Although Mims' declaration differs slightly from her deposition testimony, we disagree with the district court's conclusion that Mims' testimony is therefore too vague and conclusory to constitute direct evidence of discrimination. Mims did not assert a mere contention that race was a factor in Lambert's hiring decisions. Rather, Mims' testimony cites specific statements and, especially in light of the summary judgment standard, she does prove with sufficient particularity when the statements were made and generally who made them. Mims' and Thomas' testimony clearly and explicitly indicates that decision maker(s) in the poker room used race as a factor in employment decisions, which is by definition direct evidence of discrimination. *See Id.* Thus, we find that Jones has presented direct evidence of discrimination and accordingly, he has established a prima facie case of discrimination. The district court erred in granting summary judgment for RPG. We thus remand this case back to the district court for further proceedings consistent with this opinion.[99]

While the Court recognizes that *Jones* involved more evidence of racial animus than in the instant matter, the Court finds that the principles applied in *Jones* require a finding that Plaintiff's proffered evidence constitutes direct evidence of race discrimination.

Because Plaintiff has submitted direct evidence (as opposed to only circumstantial evidence) that race was a motivating factor in Defendant's decision making, the Court concludes that the *McDonnell Douglas* method does not govern its analysis of Plaintiff's

---

[97] *Id.* (emphasis in original).

[98] *Id.*, citing *Fabela*, 329 F.3d at 415.

[99] *Id.* at 993-94.

race discrimination claim. Plaintiff's direct evidence of discriminatory animus is adequate to demonstrate a genuine issue as to whether race was a motivating factor in the decision, thereby precluding summary judgment on the race discrimination claim. While the Defendant has presented evidence that it would have made the same decision for purely legitimate reasons, the Court believes that it is for the trier of fact to determine whether race improperly motivated this decision. Because the Court cannot make credibility determinations at the summary judgment stage, the motion for summary judgment on Plaintiff's race discrimination claim is DENIED.

### C. Disability Discrimination under the ADA

Plaintiff also claims she was subjected to discrimination based on a disability that Defendant perceived Plaintiff to have. The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, ... discharge of employees, ... and other terms, conditions, and privileges of employment."[100] The ADA also protects non-disabled persons who are "regarded as" disabled by their employers. A plaintiff is "regarded as" having a disability under the ADA if she:

> (1) has an impairment which is not substantially limiting but which the employer perceives as ... substantially limiting ...; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment.[101]

---

[100] 42 U.S.C. § 12112 (a).

[101] *Bleak v. Providence Health Center*, 454 F. App'x 366, 368 (5th Cir. Dec. 20, 2011)(quoting *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 475 (5th Cir. 2006) (quoting *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir.1996)).

Plaintiff claims that, a year prior to her termination, she began experiencing depression and anxiety after finding her fiancé collapsed from a drug overdose. Plaintiff also states that she has been a recovering alcoholic since 1999. Although Plaintiff contends these health problems did not substantially impair her ability to work, she claims that Bridges knew of these problems and may have viewed Plaintiff as unfit for work because of them. Plaintiff contends that, because she was fired not long after Bridges learned of her mental health issues, she has created a material issue of fact as to whether Plaintiff's perceived disability played a part in the decision to terminate her.

The Court must reject this claim for several reasons. First, Plaintiff fails to indicate which standard is applicable to her "regarded as" theory. Second, Plaintiff fails to address the requisites for, or show how she has satisfied, a *prima facie* case under this theory of recovery. Third, Plaintiff contends that Defendant believed she suffered from an impairment that limited her ability to work. Under the ADA, when the major life activity at issue is working, "the plaintiff must show that the employer regarded her as 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'"[102] Although it is Plaintiff's burden to make this showing, she has made no attempt to do so. Plaintiff has failed to address this requirement in her *Opposition*, and the record

---

[102] *Id.* at 368-69, quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *superseded by statute*, ADAAA, 122 Stat. 3553 (citation omitted); *see also Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1121 (5th Cir.1998) (citation omitted); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 727 (5th Cir.1995) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." (citation omitted)).

is devoid of any evidence establishing or even suggesting that Defendant considered Plaintiff unable to perform a broad range of jobs.

Furthermore, Plaintiff's assertion that Bridges' knowledge of her depression and status as a recovering alcoholic creates a fact issue as to disability discrimination is a prime example of a conclusory allegation. Unlike Plaintiff's race discrimination claim, there is absolutely zero evidence, direct or circumstantial, from which a reasonable trier of fact could infer that the Defendant regarded her as disabled or that this perceived disability motivated her suspension and termination. Not one item of evidence produced in connection with Defendant's investigation of Plaintiff's alleged misconduct referenced Plaintiff's health problems or came close to suggesting that Defendant considered them in Plaintiff's suspension and termination.

Because Plaintiff has failed to present competent evidence of the first element of a *prima facie* case under the ADA, Defendant's motion for summary judgment on this claim is GRANTED.

### D.    Family and Medical Leave Act

Following her suspension, Plaintiff alleges she became so depressed that she was hospitalized for depression at Our Lady of the Lake Regional Medical Center between July 14, 2011 to July 19, 2011. Upon her discharge, she entered an outpatient program for which she requested FMLA leave that was approved by Bridges. Because she was terminated during this FMLA leave, Plaintiff claims that Defendant interfered with her right to take leave under the FMLA and retaliated against her for taking FMLA leave.

Congress enacted the FMLA to permit eligible employees "to take reasonable leave

for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition."[103] The statute guarantees eligible employees a total of twelve weeks of leave in a one-year period when the leave relates to an employee's serious medical condition.[104] Upon the employee's timely return, the employer must reinstate the employee "to the same position as previously held or a comparable position with equivalent pay, benefits, and working conditions."[105]

The FMLA prohibits an employer from interfering with, restraining, or denying the exercise or attempted exercise of an employee's right to take FMLA leave.[106] The statute also makes it unlawful for an employer to discharge or retaliate in any other manner against an individual for opposing the employer's unlawful FMLA practices.[107]

1.    FMLA Interference

To establish a *prima facie* interference case, a plaintiff must show that: (1) she was an eligible employee, (2) the Defendant was an employer subject to the FMLA's requirements, (3) she was entitled to leave, (4) she gave proper notice of her intention to take FMLA leave, and (5) the Defendant denied her the benefits to which she was entitled

---

[103] *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir.2008) (citing 29 U.S.C. § 2601(b)(2)).

[104] 29 U.S.C. § 2612(a)(1).

[105] *Smith v. E. Baton Rouge Parish Sch. Bd.*, 453 F.3d 650, 651 (5th Cir.2006) (citing 29 U.S.C. § 2614(a)(1)).

[106] 29 U.S.C. § 2615(a)(1).

[107] *Id.* at § 2615(a)(2).

under the FMLA.[108] The Court finds that only prong five is in question in this case.

The Court finds that Plaintiff has failed to present summary judgment evidence to establish that the Defendant denied her the benefits to which she was entitled under the FMLA. The record reflects that, although Plaintiff was suspended for alleged misconduct pending a full investigation, her request for FMLA leave was granted.[109] Simply being on FMLA leave did not insulate Plaintiff from being lawfully terminated for the same conduct which prompted her suspension.

The decision in *Maldonado v. Frio County, Tex.*,[110] relied upon by Defendant, is directly on point on this issue. The *Maldonado* court found the facts of its case similar to *Serio v. Jojo's Bakery Restaurant*,[111] wherein the plaintiff was terminated shortly after requesting medical leave and argued essentially that, by ending his employment, his employer effectively denied his FMLA request.[112] In applying *Serio*, the *Maldonado* court stated:

> The district court properly recognized the "important caveat" that "[a]n employee who requests or takes protected leave under the FMLA is not entitled to any greater rights or benefits than he would be entitled to had he not requested or taken leave." *Id.* **Therefore, an employer is entitled to**

---

[108] *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012); *see also Burris v. Brazell*, 351 Fed.Appx. 961, 963 (5th Cir.2009) (*per curiam*) ("To make a prima facie case for interference with FMLA rights, [the plaintiff] must first demonstrate that she took leave that was protected under the FMLA." (citing *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 580 (5th Cir. 2006))).

[109] *See* Rec. Doc. No. 28-4, pp. 51-52 (Deposition of Linda Terry, pp. 178-179).

[110] No. A.SA-02- CA1046XR, 2004 WL 1304951 (W.D. Tex. June 1, 2004).

[111] 102 F.Supp.2d 1044 (S.D.Ind. 2000).

[112] *Maldonado*, 2004 WL 1304951 at *4, citing *Serio*, 102 F.Supp.2d at 1051.

dismiss an employee for any lawful reason at any time, whether before, during, or after an employee requests or takes leave pursuant to the FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave. *Id.; see also Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir.1998) ("[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request."). *Cf.* 29 C.F.R. § 825.216(a) (noting that employee may be laid off or refused return to shift that has been eliminated, as long as the action would have been taken in the absence of FMLA leave). **To limit an employer's ability to terminate an employee for performance issues simply because the employee requested medical leave would vest the employee with greater rights and benefits than she would have enjoyed had she continued working without requesting such leave.** *See Serio,* 102 F.Supp.2d at 1052. Thus, simply because Plaintiff's request for medical leave had been granted, she was not entitled to be retained until she completed her leave despite poor performance or other reasons justifying termination.[113]

The reasoning in *Serio*, as applied by *Maldonado*, is equally applicable in the present case. Plaintiff offers no evidence, other than her own subjective belief, that she was terminated in part because she took FMLA leave and not for the very reasons she was already suspended. Summary judgment is GRANTED on Plaintiff's FMLA interference claim.

### 2.    FMLA Retaliation

Summary judgment for a retaliation claim under the FMLA is subject to the *McDonnell Douglas* test.[114] To establish a *prima facie* case for FMLA retaliation, the Plaintiff must show that:  (1) she was protected under the FMLA, (2) she suffered an

---

[113] *Id.* (emphasis added).

[114] *Verise v. H & E Healthcare, L.L.C.* , No. 10-666, 2012 WL 5997202 at * 2 (M.D. La. Nov. 30, 2012).

adverse employment action, and (3) she either was treated less favorably than a similarly situated employee who had not requested leave or the adverse decision was made because she took FMLA leave.[115] If this showing is made, the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for the employment decision.[116] A plaintiff must then show either: (1) that the employer's reason is a pretext for discrimination; or (2) that the employer has a discriminatory or retaliatory motive in addition to a legitimate reason, or mixed motives.[117] If the employee demonstrates that the employer had a mixed motive, then the employer must show that it would have conducted the same employment action regardless of the discriminatory motivation.[118]

Plaintiff's FMLA retaliation claim fails for the same reasons as her interference claim. First, the reasoning from *Maldonado* and *Serio* discussed previously likewise applies to this claim. Additionally, Plaintiff erroneously relies on the temporal proximity between the FMLA leave and the termination in establishing the causal link between the two. While ordinarily a very close temporal proximity can be sufficient to support an inference of a causal link, the record in this case does not support Plaintiff's position. Plaintiff references the fact that the investigation of her alleged misconduct was not completed until after she was on FMLA leave; however, the record is clear and undisputed

---

[115] *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001).

[116] *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).

[117] *Id.*

[118] *Id.*

that she was advised at the time of the meeting, and *before* she requested FMLA leave, that the investigation would resume upon Bridges' return from vacation.[119] The Court finds that Plaintiff has failed to set forth a *prima facie* case of retaliation under the FMLA.

Even if Plaintiff could satisfy her burden of proving a *prima facie* case of FMLA retaliation, because the Defendant has presented legitimate, non-discriminatory reasons for Plaintiff's termination, she must present summary judgment evidence of pretext relating to her FMLA leave on the part of Defendant. No such evidence has been presented in this case. Plaintiff claims that Defendant's legitimate, non-discriminatory reasons for her termination are a pretext for discrimination for the same reasons she argued under Title VII. However, the Court maintained Plaintiff's Title VII race discrimination claim based on her presentation of direct evidence of *race* discrimination. Plaintiff cannot rely on evidence relating to race to sustain a claim of FMLA retaliation. There is simply no evidence in the record which connects Defendant's termination decision to Plaintiff's FMLA leave. Rather, the record reflects that Plaintiff's termination was imminent before she ever requested FMLA leave. Thus, Defendant's motion for summary judgment on this claim is GRANTED.

### E.    State Law Employment Discrimination Claims

Defendant moves for summary judgment on Plaintiff's state law employment discrimination claims on the grounds that they are prescribed because Plaintiff failed to file these claims within the one year prescriptive period set forth in La. Rev. Stat. § 23:303. In her *Opposition*, Plaintiff failed to address or counter Defendant's argument with respect

---

[119] Rec. Doc. No. 28-10, p. 2, ¶¶ 18 & 19.

to these claims.  Rule 56 (e) of the Federal Rules of Civil Procedure requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.[120] As Plaintiff has failed to comply with this rule, Defendant's motion for summary judgment on the Louisiana Employment Discrimination Law claims is GRANTED.

## III.  CONCLUSION

For the reasons set forth above, the *Motion for Summary Judgment*[121] by Defendant Promise Hospital of Ascension, Inc. is hereby GRANTED on Plaintiff's ADA claims, FMLA claims, and Louisiana Employment Discrimination Law Claims.  These claims are dismissed with prejudice.  The Defendant's motion is DENIED as to Plaintiff's Title VII race discrimination claim.

IT IS SO ORDERED.

Baton Rouge, Louisiana, this _19_ day of August, 2014.

SHELLY D. DICK, DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

---

[120] *Savers Federal Sav. & Loan Ass'n v. Reetz*, 888 F.2d 1497, 1501 (5th Cir.1989).  In fact, the Fifth Circuit has "specifically refused to overturn a summary judgment on a theory not advanced in opposition to the motion in the district court." *Id.; see also Batterton v. Tex. General Land Office*, 783 F.2d 1220, 1225 (5th Cir.1986) (affirming district court's denial of a motion for reconsideration on a pleaded claim that the party failed to argue and support in opposition to summary judgment).

[121] Rec. Doc. No. 28.